Jose Manuel **FIGUEROA–RODRIGUEZ,**
et al., Plaintiffs, Appellees,

v.

Aurelio **LOPEZ–RIVERA,** etc.,
Defendant, Appellant.

Jose Manuel **FIGUEROA–RODRIGUEZ,**
et al., Plaintiffs, Appellees,

v.

Aurelio **LOPEZ–RIVERA,** etc.,
Defendant, Appellee.

Appeal of Alice **NET–CARLO.**

Nos. 87–1319, 87–1320.

United States Court of Appeals,
First Circuit.

April 22, 1988.

Alice Net Carlo with whom Law Offices of Garcia Rodon, Correa Marquez & Valderas, Hato Rey, P.R., was on brief, for defendant, appellant.

Pedro Miranda Corrada, San Juan, P.R., with whom Hector Urgell Cuebas was on brief, for plaintiffs, appellees.

Before TORRUELLA and SELYA, Circuit Judges, and CAFFREY,[*] Senior District Judge.

SELYA, Circuit Judge.

This is yet another of the long, gray line of suits brought pursuant to 42 U.S.C. § 1983 in the aftermath of Puerto Rico's 1984 gubernatorial election. Like most of the others, this action involves claims of politically motivated firings said to be violative of the principles announced in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574

(1980). The affected employees, Jose Manuel Figueroa Rodriguez (Figueroa) and Luis Raul Roig Perez (Roig), were professional fire-fighters of long standing. Each occupied a substantially identical position as a "Zone Firemen Chief" (ZFC) in the Puerto Rico Fire Service. When ousted by defendant-appellant Aurelio Lopez Rivera (Lopez), the newly-appointed Chief,[1] plaintiffs sued for reinstatement, damages, and other redress. The adverse employment actions were, they averred, politically inspired.

After some preliminary skirmishing (not here material), Lopez moved for summary judgment. He claimed that a ZFC was a "policymaker" and that political affiliation was a suitable credential for such a post. The district court denied the motion. *Figueroa v. Lopez Rivera,* 657 F.Supp. 125, 128 (D.P.R.1987). Because it thought the Rule 56 motion "meritless and frivolous," the court also fined defendant and his counsel $1000, jointly. *Id.* at 128. Lopez, clambering through the jurisdictional window framed by the Court's decision in *Mitchell v. Forsyth,* 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–17, 86 L.Ed.2d 411 (1985), appealed the denial of his Rule 56 motion; he and his counsel, appellant Alice Net Carlo, also appealed the imposed sanction.

I

Under *Mitchell,* our role as to the first (merits) appeal is severely circumscribed. We can pass only on the question of whether partial summary judgment based on qualified immunity should have been ordered. *See Vazquez Rios v. Hernandez Colon,* 819 F.2d 319, 320 (1st Cir.1987). We express no opinion on any other merits-related issues discussed in the district court's opinion.

Earlier today, this same panel filed an opinion which, we believe, expresses our basic views on the qualified immunity issue. *See Fontane–Rexach v. Puerto Rico*

---

[*] Of the District of Massachusetts, sitting by designation.

1. The Chief is the head of the Fire Service. His second in command is the Deputy Chief. Under them, the organization chart spawns four co-

equal divisions (administration, training, prevention, and extinguishing). The last, which has the responsibility for hands-on firefighting, is split along geographic lines into four zones. Each zone operates under a ZFC.

*Electric Power Authority,* 878 F.2d 1493. We regard *Fontane–Rexach* as a qualtagh for purposes of Lopez's appeal. Appellees, like Fontane–Rexach himself, occupy "positions involving matters devoid of partisan concerns," op. at 1494 (quoting *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1258 (1st Cir.1987)). That being so, the *Elrod/Branti* inquiry is answered and any need to consider whether ZFCs are policymakers is eliminated.

We need illustrate this but briefly. The record contains an uncontested official job description formulated by the Puerto Rico Central Office of Personnel Administration. We attach it in full as an appendix. It can readily be seen that the duties and responsibilities of the position, while meaningful, are politically neutral. Unlike, say, the Chief—whose work is politically sensitive and who is a prime instrument of the administration in implementing its legitimate political goals—a ZFC's work is weighted heavily toward technical and professional matters, *e.g.,* "direct[ing] ... fire extinction and rescue work in his area," insuring "that the fire [fighting] equipment ... is always maintained in optimum working conditions," coordinating the flow of work by promulgating "work plans" and "giv[ing] follow-up to same," and by "maintain[ing] the system of work shifts." Appendix, *infra,* at 1492. Moreover, a ZFC is required to have both specialized training and experience, as well as distinctive knowledge of professionally-gaited matters like "modern principles, practices and procedures of fire prevention and extinction" and of "the use, operation and maintenance of fire fighting equipment." *Id.* at 1492. The science of fire extinguishment is not logically divisible into a "PNP method" and a "PDP method." [2] A report of a burning building, one hopes, would bring the same swift, workmanlike response irrespective of the political leanings of the owner or occupant. Coordination of a zone-wide plan for, say, inspecting fire hydrants, seems (canine constituencies excepted) a politically neutral task. And the paramilitary structure of public safety agencies like the Fire Service requires fealty to the institution, not to any political party.

In brief, the functions of a ZFC are remote from any partisan-responsive goals which the Fire Service may legitimately possess. The policy-implementing component of the job is, in the main, politically neutral. The need for strict professionalism is compelling. Under *Elrod/Branti,* and for some of the same reasons elucidated in *Fontane–Rexach,* 878 F.2d at 1494–1496. Political affiliation seems not to be an appropriate requirement for such an office.

## II

Lopez argues that, even if the ZFC positions were in the shelter of *Elrod/Branti,* that fact was not "clearly established" when he gave a new twist to an old holiday and cashiered both plaintiffs effective April 1, 1985. We disagree.

The legal theorems and precedents by which this contention must be judged are set forth in *Fontane–Rexach,* 878 F.2d at 1496–1498. The instant case is plainer still. As we see it, the protected nature of the employment was "manifestly evident in the doctrinal underpinnings of the general rule [announced in *Elrod* and *Branti* ] concerning when—and under what circumstances—pure patronage dismissals might or might not be justifiable." *Vazquez Rios,* 819 F.2d at 326. Indeed, there is precious little in the way of a conceptual difference between a ZFC and the chief deputy in the Cook County Sheriff's Office.[3] In the same vein, a parallel can be drawn between a ZFC and the hypothetical head coach of a

---

**2.** The Partido Nuevo Progresista (PNP) ruled Puerto Rico prior to the 1984 general election, which was won by the Partido Popular Democratico (PPD).

**3.** John Burns, Chief Deputy of the Process Division of the Cook County Sheriff's Office, supervised all departments of the office housed on one floor of a large office building. *Elrod,* 427 U.S. at 350–51, 96 S.Ct. at 2678–79. Justice Brennan, in the Court's very first formulation of what has evolved into the *"Elrod/Branti* doctrine," ruled that Burns's position was safe from patronage dismissal.

state university's football team, of whom Justice Stevens wrote: "The coach ... formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of state government." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95. *See also Fontane–Rexach,* 878 F.2d at 1497 (and cases discussed therein); *Vazquez Rios,* 819 F.2d at 328–29 (law clearly established in 1985 as to nonpolitical status of, *inter alia,* supervisor of domestic services at Governor's mansion); *Jones v. Dodson,* 727 F.2d 1329, 1338–39 (4th Cir.1984) (chief deputy sheriff protected against patronage dismissal).[4]

There is, to our way of thinking, a fundamental difference between a public safety agency, such as the Fire Service or a police department, on the one hand, and a social service agency on the other. In the former case, the agency's role, for the most part, concerns matters about which there is no room for political disagreement. Except at the highest levels of authority—levels which we need not pinpoint, but which plainly surpass that attained by a ZFC—ideologic orientation is (or should be) immaterial. Beneath the top rank, even policymaking should have no bearing on the agency's partisan-responsive goals; *a fortiori,* the same should be true of policy implementation. In the social services area, this clearcut separation of politics from practice often does not exist. *See, e.g., Bonilla v. Nazario,* 843 F.2d 34, 36–37 (1st Cir.1988) (discussing Puerto Rico Automobile Accident Compensation Administration); *Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258, 260–61 (1st Cir.1987) (discussing Rural Housing Administration). As a result, party affiliation may well be an appropriate qualification for certain social service jobs but totally inappropriate for public safety posts of roughly coequal rank.

The long and the short of it, we think, is that a third-tier job in a public safety agency such as the Fire Service, organized along paramilitary lines, could not reasonably have been considered "grist for the political mill." *Fontane–Rexach,* 878 F.2d at 1498. *Elrod,* after all, held as much. *See supra* note 3. It follows that, on the record presently before us, Lopez did not enjoy qualified immunity.

### III

The last remaining matter pertains to the sanction; it is, as a game-show host might phrase it, "the $1000 question." The fine was levied under Fed.R.Civ.P. 16(f), the relevant text of which we have set out in the margin.[5] In imposing it, the district court ruled that defendant's summary judgment motion "was meritless and frivolous, and delayed the Court's attention to other matters." *Figueroa,* 657 F.Supp. at 128.

Section (f) was born in 1983, when a sweeping overhaul of Rule 16 was undertaken. The amendments were aimed primarily at "encourag[ing] pretrial management that meets the needs of modern litigation." Fed.R.Civ.P. 16 advisory committee's note, *reprinted in* 97 F.R.D. 165, 206 (1983). In these days of increasingly complicated cases and burgeoning filings, judges must have at their fingertips smooth-running, productive machinery for conducting litigation and managing caseloads. Section (f) is meant to be the judicial stick which insures that lawyers and litigants partake of the carrot of increased efficiency.

---

**4.** We acknowledge that the four ZFC positions are all denominated as "trust" positions (*"de confianza"*) under P.R.Laws Ann. tit. 3, §§ 1349–51 (1978). This circumstance, though it is to be considered, does not answer the *Elrod/Branti* inquiry. *See Fontane–Rexach,* 878 F.2d at 1495 n. 3; *Jimenez Fuentes v. Torres Gatzambide,* 807 F.2d 236, 246 (1st Cir.1986) (en banc).

**5.** Rule 16(f) provides in pertinent part:

> If a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference, or if a party or party's attorney is substantially unprepared to participate in the conference, or if a party or party's attorney fails to participate in good faith, the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, ....

The rule, however, is narrow-gauged. It authorizes the imposition of sanctions in only four specific instances: (1) failure to obey a scheduling or pretrial order, (2) failure to appear at a scheduling or pretrial conference, (3) substantial unpreparedness on the occasion of such a conference, or (4) failure to participate in such a conference in good faith. Fed.R.Civ.P. 16(f). Its use must be limited accordingly; Rule 16(f) sanctions cannot be prescribed as a panacea to cure the ills of a bar which sometimes falls short of meeting, generally, acceptable standards of practice. Moreover, nothing about the rule divorces it from the usual requirement that findings be made adequate to support its invocation. *Cf. Salahuddin v. Harris,* 782 F.2d 1127, 1133 (2d Cir.1986) (adoption of Rule 16(f) "did not loose a strange and capricious new beast").

In this case, the district court made no findings which would bring the case within the ambit of Rule 16(f), nor is it evident on the face of the record that one or more of the four venal sins which the rule proscribes was committed. The conclusory statement that the motion was "meritless and frivolous," unsupported by particularized subsidiary findings or by an explication of the court's reasoning with respect to when and how Rule 16 was trammelled, is not enough to sustain the imposition of sanctions. *Cf. Pearson v. Fair,* 808 F.2d 163, 165–66 & n. 2 (1st Cir.1986) (per curiam) (discussing need for articulated findings of fact under Rule 52(a)); *Lyles v. United States,* 759 F.2d 941, 943–44 (D.C. Cir.1985) (similar). This failure, we think, is especially telling because the filing of a "meritless and frivolous" pleading does not, in itself, transgress Rule 16.[6]

Because the record as it stands does not support the conclusion that Rule 16(f) was countervailed, we are constrained to hold that the district court abused its discretion in imposing the fine. Having said as much,

let us remark that we share the concerns of an able district judge that state actor defendants in section 1983 cases may be filing *Mitchell* -type motions "as a matter of course, without regard to the facts or the applicable jurisprudence." *Figueroa,* 657 F.Supp. at 128. As the law becomes better and better defined in this circuit in patronage dismissal cases, the *Elrod-Branti* spectrum contracts, and there is less and less basis either for claiming qualified immunity or for denying the existence of qualified immunity in cases which fall at one of the ends of the continuum. We are confident, however, that Rule 11—which we have recently construed as requiring attorneys "to conduct [themselves] in a manner bespeaking reasonable professionalism and consistent with the orderly functioning of the judicial system," *Sullivan,* 843 F.2d at 598–599—will serve as an adequate brake should the bar's zeal overwhelm its judgment.

## IV

We need go no further. In our view, the district court did not err in denying defendant's motion for partial summary judgment on the basis of qualified immunity. The lower court misused its discretion, however, which necessitates that the fine imposed under Rule 16(f) be vacated.

Appeal No. 87–1319 is overruled and the order refusing summary judgment is affirmed. Costs in favor of appellees.

Appeal No. 87–1320 is sustained and the order imposing sanctions is vacated. No costs.

## APPENDIX

ZONE FIREMEN CHIEF        6316

NATURE OF THE JOB

This is highly responsible administrative and supervisory work which comprises directing the activities which are developed

---

6. "[B]aseless filings" can, of course, run afoul of Fed.R.Civ.P. 11, *see In re D.C. Sullivan Co.,* 843 F.2d 596, 600 (1st Cir.1988), and thereby support a sanctions order. And an attorney "who so multiplies the proceedings in any case as to increase costs unreasonably and vexatiously can be ordered to defray the excess costs under 28 U.S.C. § 1927. The district court, however, did not invoke either of these authorities, and we, therefore, take no view of their applicability in this instance.

within a zone of the Puerto Rico Fire Department.

## DISTINCTIVE ASPECTS OF THE JOB:

The employee performs work which is extremely difficult and has a lot of administrative responsibility in planning, directing and supervising the activities of the Fire Department in the zone under his charge. Participates actively in the formulation of the policies to be followed with respect to the prevention and extinction of fires. Exercises direct supervision over the Chiefs of the District Firemen in their zone and generally over the remaining personnel of the Fire Department assigned to the zone. Performs his functions with entire freedom of criteria, using the established methods and procedures, which are in agreement with the norms and policies set forth by the agency. Works under the administrative direction of the Chief and Assistant Chief of the Fire Department, who review his work through the evaluation of the reports which he prepares and through the achievements obtained.

## TYPICAL EXAMPLES OF THE JOB:

Plans, directs, supervises and coordinates the activities of the Fire Department in the zone under his command.

Supervises the personnel assigned to his zone.

Sets forth the work plans of the zone and gives follow-up to same.

Directs the task of fire extinction and rescue work in his area.

Edits and reviews correspondence and reports on fires and other required aspects of the job.

Interprets the laws, regulations and norms applicable to the job.

Assumes command over all the fire extinction operations in his zone, unless relieved by the Chief or Assistant Chief of the Fire Department.

Maintains the system of work shifts of the Officers assigned to the districts comprised within the zone.

Insures that the fire equipment assigned to the zone is always maintained in optimum working conditions.

Visits and effects periodic inspections of the Fire stations in the zone.

Coordinates a plan for inspecting fire hydrants with the Chiefs of District Firemen under his supervision.

Coordinates with the Chiefs of District Firemen under his supervision, a plan for effecting inspection visits on factories, businesses, industries and other facilities in the zone as part of the fire prevention program.

Prepares reports for the Chief and the Assistant Chief of the agency on the work performed in the zone and others required.

Performs other related required tasks.

## KNOWLEDGE, ABILITY AND MINIMUM SKILLS

Considerable knowledge on the modern principles, practices and procedures of fire prevention and extinction.

Considerable knowledge of the rules and regulations of the Fire Department and the laws and regulations pertaining to fire prevention.

Considerable knowledge on the use, operation and maintenance of fire fighting equipment.

Ability to plan, assign, direct and coordinate the work of a group of operational units and to instruct and supervise subordinate personnel.

Ability to prevent the risk of fire in the assigned zone.

Ability to establish and maintain effective labor relations with the subordinates, officials and officers of the agency and the general public.

Ability to express oneself clearly and precisely, verbally and in writing.

## PREPARATION AND MINIMUM EXPERIENCE

Graduation from fourth year high school, complemented by formal training courses in the methods and techniques of preventing and extinguishing fires. Six (6) years experience in all phases of fire extinction

and prevention, one of which must be in functions comparable in nature and complexity to those performed by a District Fire Chief II.

PROBATIONARY PERIOD

Eight (8) months.

(handwritten note "This has not be revised by the Fire Department but is not followed")

By virtue of the authority conferred upon me by Section 4.2 of Law 5 of October 14, 1985, Law of Personnel in Public Service, I hereby approve the preceding new class which will become part of the Classification Plan as of December first, 1977. San Juan, Puerto Rico, December 6, 1977.

> (sgd.) José R. Feijoo
> José Roberto Feijoó, Esq.
> Director